**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| BLADEROOM GROUP LIMITED, et al.,<br><br>        Plaintiffs,<br><br>        v.<br><br>FACEBOOK, INC., et al.,<br><br>        Defendants. | No. MC 17-92-R (PLAx)<br><br>**ORDER RE: PLAINTIFFS' MOTION TO COMPEL COMPLIANCE WITH SUBPOENA** |

**I.**

**BACKGROUND**

On October 31, 2016, in connection with a lawsuit pending in the United States District Court for the Northern District of California,[1] in which plaintiffs sued, among others, defendants Emerson Electric Company, Emerson Network Power Solutions, Inc., and Liebert Corporation (collectively "Emerson") for conspiring to misappropriate plaintiffs' trade secrets and confidential information related to designs and construction methods for prefabricated, warehouse-sized modular data centers, plaintiffs served non-party Platinum Equity Advisors, LLC ("Platinum") with

---

[1] See Case No. 15-cv-1370-EJD-HRL, pending in the United States District Court for the Northern District of California.

a subpoena to produce documents in the Central District of California. (ECF No. 1 at 1-2). On July 14, 2017, plaintiffs and Platinum filed a Joint Stipulation ("JS") in this Court with respect to plaintiffs' Motion to Compel ("Motion or "Mot.") Platinum to comply with the subpoena. (ECF No. 1). The Motion was set for hearing on August 4, 2017. On July 21, 2017, plaintiffs filed a Supplemental Memorandum in support of their Motion. (ECF No. 6). On July 26, 2017, Platinum filed a Supplemental Memorandum.[2] (ECF No. 11).

Having considered the pleadings submitted in connection with the Motion, the Court has concluded that oral argument will not be of material assistance in determining the Motion. Accordingly, the hearing scheduled for August 4, 2017, is **ordered off calendar**. See Local Rule 7-15.

## II.

## THE DISPUTE

By way of background, plaintiffs contend that Facebook hired Emerson to construct a large prefabricated, modular data center, which defendants call a "rapid deployment data center" ("RDDC"), for Facebook's campus in Sweden, allegedly using plaintiffs' stolen trade secrets and confidential information. (JS at 1 (citations omitted)). Plaintiffs also contend that Emerson used plaintiffs' trade secrets and confidential information to launch a new business focused on selling massive data centers using RDDC techniques to Facebook and eventually to other companies as well. (Id.). In 2015, Emerson Electric Company took steps to spin-off a number of business entities referred to collectively as "Emerson Network Power." (JS at 2 (citing JS Ex. D)). Ultimately, Emerson Electric Company sold Emerson Network Power to non-party Platinum for

---

[2] Platinum's Supplemental Memorandum was untimely. See Local Rule 37-2.3 (each party may file a supplemental memorandum of law not later than fourteen days prior to the hearing date, i.e., by July 21, 2017). However, its Supplemental Memorandum attaches an Order entered on July 25, 2017, relating to a discovery dispute between the parties in the underlying litigation. (Platinum's Supp'l Mem. at 2). That dispute, and an Order previously entered by Northern District Magistrate Judge Howard R. Lloyd, was referenced by plaintiffs in their Motion and attached to the Joint Stipulation as Exhibit H. As the July 25, 2017, Order clarifies Judge Lloyd's earlier Order, the Court will take judicial notice of the July 25, 2017, Order entered in the Northern District.

$4 billion in December 2016. (Id. (citing JS Ex. E)). Platinum now operates this business under the "Vertiv" brand. (Id. (citing JS Ex. G)).

There are five requests ("Requests") in the subpoena that are at issue in plaintiffs' Motion:

**Request for Production No. 3**: All Documents that refer to, summarize, describe, or constitute valuations of Emerson Network Power;

**Request for Production No. 4**: All Documents that refer to, summarize, describe, or constitute valuations of Emerson Network Power's Data Center business and products;

**Request for Production No. 5**: All Documents that refer to, summarize, describe, or constitute valuations of Emerson Network Power's Modular Data Center business and products;

**Request for Production No. 8**: All Documents relating to the Litigation. This Request includes but is not limited to [a]ll communications between [y]ou and Emerson Electric Co. or Emerson Network Power regarding the Litigation; and

**Request for Production No. 13**: All Documents that refer to, summarize, describe, or constitute valuations of Emerson Network Power's 'unified infrastructure' business, whether referred to as "Integrated Modular Solutions," "IMS," or otherwise.

(JS at 6-9).

Platinum objected to Request numbers 3-5 and 13 on the grounds that the Requests are vague and ambiguous with respect to the term "valuations"; call for documents that are not relevant and proportional to the needs of the case; are overly broad and unduly burdensome, "particularly to the extent the documents are readily available from a party to the litigation"; require the disclosure of trade secret information or other confidential research, development, or commercial information, or disclosure of any entity's proprietary, trade secrets or other competitively sensitive information without consent of the other entity; and/or constitute an improper attempt to obtain an unretained expert's opinion or information. (Id.).

3

In response to Request number 8, Platinum objected on the grounds that the Request calls for attorney-client privileged and/or attorney work product protected information; is unduly burdensome and overly broad as the information is publicly available and likely to already be in the possession of plaintiffs and/or is easily obtained from a party to the litigation; and also seeks disclosure of another entity's proprietary, trade secret, or other competitively sensitive information without the consent of that entity. (JS at 8).

Plaintiffs state that Platinum served "written responses and objections to the subpoena and produced five documents . . . ." (JS at 9). They state that they have met and conferred with Platinum "several times over the course of many months . . . in the hopes that Platinum would agree to produce further documents responsive to the subpoena, to no avail." (JS at 10 (citing JS Exs. J-L)). They agreed to narrow their requests to "seek Platinum's own *internal* valuation documents because Platinum likely went through a different valuation process than Emerson did to come to the agreed-upon $4 billion sales price for Emerson Network Power," as well as "any *internal* Platinum documents" relating to the underlying litigation, but Platinum refused to produce even those documents, necessitating this Motion. (JS at 3, 10-11).

**A.    PLAINTIFFS' ARGUMENTS**

According to plaintiffs, the Requests seek documents "concerning what portion of the $4 billion sales price each of Emerson and Platinum attributed to the prefabricated modular data center business built on Plaintiffs' trade secrets and confidential information because this information is relevant to Plaintiffs' damages and Defendants' unjust enrichment." (Id.). Plaintiffs claim that Judge Lloyd, presiding over the underlying litigation discovery disputes, "confirmed the necessity of obtaining this information," when he ordered Emerson "to produce its documents relating to valuation that are of the same scope of valuation documents Plaintiffs request from Platinum" in this Motion.[3]  (JS at 2-3, 12-13 (citations omitted)). Plaintiffs note that Judge Lloyd

---

[3]  In his July 25, 2017, Order, Judge Lloyd clarified his earlier ruling, stating that he "did not intend to order production of valuation information on all the units sold off under the brand name
(continued...)

4

held that plaintiffs' "requests for production [to Emerson] related to Emerson's valuations of the businesses sold to Platinum are 'on target'[4] and . . . order[ed] Emerson to produce all responsive documents 'that "refer" to valuations (even if no numbers are mentioned).'" (JS at 13 (quoting JS Ex. H)). They argue that the Requests do not impose an undue burden or expense on Platinum because they are "narrowly tailored to reach documents that are of particular relevance to damages and unjust enrichment claims," and because they have narrowed their Requests "to seek only *internal* Platinum documents related to Platinum's valuation of Emerson Network Power and Platinum's documents referring to the underlying litigation." (JS at 14 (citing JS Ex. M)). Plaintiffs submit that Platinum has "confirmed that it does in fact have a valuation analysis that it performed prior to acquiring the Emerson entities in 2016." (Id. (citing JS Ex. K)). They argue that Platinum cannot avoid producing the requested documents simply because they may also be available from Emerson, a party to the litigation. (JS at 14-15). With respect to documents discussing the underlying litigation, plaintiffs argue that such documents could be highly relevant to plaintiffs' damages claims "if they, for example, attempt to value the potential loss Emerson might be liable for if Plaintiffs prevail on their claims." (JS at 13). Finally, plaintiffs submit that further delay in obtaining the requested documents will be extremely prejudicial to them because, despite the Northern District Court's June 30, 2017, deadline for completing fact discovery, the parties have agreed to extend that deadline with respect to this discovery, and further delay will "hamper

---

[3](...continued)
Emerson Network Power." (Platinum's Supp'l Mem. Ex. A at 3). Instead, he intended to order production "of all available valuation information" only on the discrete entities of Emerson Network Power Solutions, Inc., Liebert, and the Hyperscale division. (Id.). Thus, contrary to plaintiffs' argument, the scope of the documents Judge Lloyd ordered to be produced is *not* the same scope of the documents sought by plaintiffs herein, which are "global" in nature and not specific to the individual entities at issue in the litigation. Otherwise, Platinum's untimely Supplemental Memorandum has had no other impact on the Court's decision herein.

[4] The phrase "on target" appears to reflect the difference between certain requests for production Judge Lloyd found to be acceptable, and ones which Judge Lloyd found to be "too broad to be proportional to the needs of the case, [with] words like 'relating to' and 'relied upon' . . . worryingly vague." (JS Ex. H at 117).

Plaintiffs' ability to explore the facts of the acquisition during Platinum's deposition" on August 31, 2017. (JS at 3 n.3, 15, 16).

### B. PLATINUM'S ARGUMENTS

Platinum notes that it understands the underlying dispute to involve "only two of the many corporate entities that operated under the Emerson Network Power umbrella, specifically Defendants Emerson Network Power Solutions, Inc. and Liebert Corporation." (JS at 3-4). It states that it has "repeatedly informed Plaintiffs that it did not perform valuations of Emerson Network Power's specific assets because private equity firms do not conduct that form of analysis when purchasing large businesses such as Emerson Network Power." (JS at 17). Thus, Platinum's highly proprietary and confidential pricing models, "which are not 'valuations'," "[did] not specifically analyze the subject technology at issue in the litigation or perform a valuation with regards to any of Emerson Network Power's specific assets." (JS at 19, 21-22). Instead, the pricing models analyzed Emerson Network Power "*on a global basis* without regard to its specific assets," and without analyzing or putting a price tag on the value of the subject technology at issue and, therefore, do not reflect the value of the technology or the business sub-units at issue in the underlying dispute. (Id.). Therefore, Platinum argues, plaintiffs have failed to show how Platinum's pricing models would be relevant "when they do not analyze or put a price tag on the value of the subject technology at issue," or the business units at issue. (JS at 17, 19-20). It notes that the components used in Platinum's confidential formulas are entirely historical data publicly available relating to Emerson's earnings before interest, tax, depreciation, and amortization ("EBITDA"), and contain other proprietary processes and assumptions employed by the private equity firm, and Emerson's historical EBITDA data is readily available from the Emerson defendants that are parties to the litigation. (JS at 4, 21). Indeed, plaintiffs have admitted that they have requested this same information from defendants and that Judge Lloyd has ordered defendants to produce some of it. (Id.; Platinum's Supp'l Mem. Ex. A at 3; see infra note 3). Platinum also submits that its pricing models contain proprietary and highly-confidential information and trade secrets regarding both Platinum's and Vertiv's businesses, and are only

6

disseminated to a small group of employees, who are subject to strict non-disclosure agreements. (JS at 22, 23). Disclosure of these documents would be extremely detrimental to both Emerson Network Power (now Vertiv) and Platinum, as plaintiffs are not only their market competitors, but potential M&A competitors and/or counterparties with respect to future M&A opportunities; and, pursuant to the terms of the underlying agreement with Emerson, there are ongoing obligations between Platinum and Emerson. (JS at 23-24). Platinum concludes that it should not be compelled to produce to a competitor its "highly-confidential, proprietary and trade secret pricing models" when plaintiffs have failed to show that they are even relevant to the underlying dispute (JS at 20), or that they have a substantial need for the information. (JS at 24). Platinum believes that the Requests "appear to be an attempt to force Platinum to be Plaintiffs' *de facto* damages expert" (JS at 17), and they should not be permitted to obtain Platinum's documents as a "replacement for expert testimony." (JS at 25). Platinum also submits that plaintiffs cannot show a substantial need for the pricing information because they already have knowledge of the total purchase price paid for the acquisition, and they have access to the historical financial information and valuation materials from defendant Emerson, itself a party. (JS at 24).

With respect to Request number 8, Platinum states that in searching for documents it was only able to view the public version of the Complaint in the underlying dispute, "which was heavily redacted, thereby making it nearly impossible to discern what documents could be responsive." (JS at 20). Platinum represents that it has no documents in its possession "discussing the litigation and the value of the potential loss that Emerson might be liable for if Plaintiffs prevail on their claims." (Id.). It states that during the acquisition, it conducted little due diligence into the underlying litigation because "the purchasing entity and its affiliates have received indemnification under the terms of the agreement with Emerson Electric." (Id.). Platinum also argues that it is an unnecessary burden placed on it as a non-party to require it to provide documents that are in the possession of a party defendant. (Id. (citations omitted)).

Finally, Platinum notes that the meet and confer between it and plaintiffs was completed in approximately February 2017. (Id.). It suggests that plaintiffs' contention that this Motion is

7

"urgent," therefore, when it waited five months to even bring it, is "illusory at best" (JS at 17-18), and any urgency is a result of plaintiffs' own delay. (JS at 25).

Platinum requests that the Court deny the Motion and quash the subpoena.

### C. PLAINTIFFS' SUPPLEMENTAL ARGUMENTS

In their Supplemental Memorandum, plaintiffs contend that "market-based data [is treated by courts as] informative and reliable evidence to help assess the amount of damages that should be awarded in a case," and that "Platinum's valuation of Emerson Network Power provides the most direct evidence of how the market values its business." (Supp'l Mem. at 1). They argue that this information -- showing how Platinum valued the business and its potential in the marketplace from a purchaser's perspective -- "is directly relevant to Plaintiffs' unjust enrichment and reasonable royalty claims in the underlying case." (Id.). They assert that "even if Platinum's 'pricing' models are created on a 'global basis,' they must by definition include pricing of the business units whose earnings are attributable to Emerson's trade secret misappropriation." (Supp'l Mem. at 2). Plaintiffs submit that Platinum admits that the models "also include *prospective information* (business plans and projections) concerning Vertiv's post-acquisition business,"[5] which is information that is not publicly available and "is relevant to Plaintiffs' damages because the prospective information would also include the business units for which earnings are attributable to Emerson's trade secret misappropriation"; that when Emerson Electric Company sold Emerson Network Power for $4 billion, "it realized an unfair benefit at Plaintiffs' expense that must be disgorged"; that the pricing model is also relevant because "it is recent, representative, and market-based evidence of the value of Emerson Network Power and its underlying entities"; and that the figure paid is "in contrast to Emerson's own initial valuation of Emerson Network Power that concluded at a substantially different value and utilized an entirely different methodology." (Id.). They suggest that Platinum's models "may provide Plaintiffs' experts with

---

[5] What Platinum actually stated was that its modeling "necessarily incorporates various highly-confidential business assumptions including plans for strategic initiatives, potential future acquisitions or divestitures, or other projected business changes." (Kotzubei Decl. ¶ 11).

8

a basis to disaggregate this information to a more granular level, which would provide potentially relevant information for Plaintiffs' damages" and, even "if they cannot be disaggregated, these models would likely still provide relevant information for Plaintiffs' damages." (Supp'l Mem. at 3). They argue that because *Emerson's* pre-acquisition documents discussed "the contribution of the business units whose earnings are attributable to Emerson's trade secret misappropriation to Emerson Network Power's overall growth rate," then "*Platinum's* models may provide an explicit methodology to value such contributions." (Id. (emphasis added)). Finally, plaintiffs argue that the protective order issued in this action will protect Platinum's confidential and proprietary models. (Supp'l Mem. at 3-5).

## III.
## DISCUSSION

### A. LEGAL STANDARDS

Preliminarily, the Court will examine the issues in this Motion using the standard set forth in Federal Rule of Civil Procedure 26 ("Rule 26") (as amended December 1, 2015). Rule 26 provides that a party may obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1). Factors to consider include "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Id. Discovery need not be admissible in evidence to be discoverable. Id. However, a court "must limit the frequency or extent of discovery otherwise allowed by [the Federal] rules" if "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C). Finally, the Court is mindful of the imperative that the Federal Rules of Civil Procedure be "construed, administered, and employed

by the court *and the parties* to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1 (as amended December 1, 2015) (emphasis added); see also Landis v. N. Am. Co., 299 U.S. 248, 254-55, 57 S. Ct. 163, 81 L. Ed. 153 (1936) (a court has the inherent power "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants" and "[h]ow this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance").

In cases involving discovery from third parties, Rules 26 and 45 of the Federal Rules of Civil Procedure control. Exxon Shipping Co. v. U.S. Dep't of Interior, 34 F.3d 774, 779 (9th Cir. 1994). Under Rule 26, a court may, "for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," including by forbidding the disclosure or discovery. The party seeking to limit discovery has the burden of establishing grounds for the issuance of a protective order. Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975). When a subpoena requires the disclosure of "privileged or other protected matter, if no exception or waiver applies," it must be quashed or modified. Fed. R. Civ. P. 45(d)(3)(A)(iii). A subpoena requiring disclosure of trade secrets or other confidential information may also be quashed. Fed. R. Civ. P. 45(d)(3)(B)(i).

**B.   ANALYSIS**

    **1.   Request Nos. 3-5 and 13**

As discussed above, these Requests seek documents relating to valuations of "Emerson Network Power." However, Emerson Network Power apparently includes a "number of business entities" spun off by Emerson Electric Company, and not just the two entities -- Emerson Network Power Solutions, Inc. and Liebert Corporation -- accused in the underlying litigation of conspiring to misappropriate plaintiffs' trade secrets and confidential information. Platinum has represented that any analyses of Emerson Network Power prior to Platinum's purchase of Emerson Network Power was done on a "global basis without regard to its specific assets" or sub-units. (JS at 21-22). Plaintiffs suggest that even if the analyses were done on a global basis, they "must by definition include pricing of the business units whose earnings are attributable to Emerson's trade

1 secret misappropriation," and that their experts might be able to disaggregate the information to
2 provide relevant information for plaintiff's damages. (Supp'l Mem. at 2).  This is nothing more than
3 pure speculation, and is controverted by Platinum's evidence, which includes the Declaration of
4 Jacob Kotzubei, a partner at Platinum who "served as the deal lead during the process that
5 culminated in the acquisition of Emerson Network Power by affiliates of Platinum in 2016." (JS
6 Kotzubei Decl. ¶¶ 1-2).  Mr. Kotzubei stated, under penalty of perjury, that the pricing models
7 created for this acquisition, "were created on a global basis relating to the total earnings of the
8 business" and were not based on "any single entity, asset or collection of assets." (Kotzubei Decl.
9 ¶ 6).  He further asserted: "[t]o be clear, Platinum did not create a valuation of the so-called trade
10 secrets at issue in this litigation or of the specific entities that may hold those assets."  (Id. ¶ 7).

11       In short, Platinum, through Mr. Kotzubei, has shown that documents that refer to the
12 individual "business units whose earnings are attributable to Emerson's trade secret
13 misappropriation," simply do not exist. (JS at 4, Kotzubei Decl. ¶¶ 3-7).  Plaintiffs have not shown
14 the Court any reason to believe otherwise.  While plaintiffs may have shown that the requested
15 documents -- *if* they had been prepared based on individual pricing of the "business units whose
16 earnings are attributable to Emerson's trade secret misappropriation" -- *might be* relevant to
17 plaintiffs' damages and defendants' unjust enrichment, they have *not* shown that documents that
18 do not include valuations or assessments of the individual entities included in the purchase would
19 be similarly relevant and proportional to the needs of the case.  Indeed, the Court notes that Judge
20 Lloyd's July 25, 2017, Order compelling only Emerson Network Power Solutions, Inc., Liebert, and
21 the Hyperscale division, to produce valuation documents was based at least in part on the fact that
22 the "Emerson defendants had produced a document giving a breakdown of the value attributed
23 to each of the sub-units that were sold," "one of which was where (according to plaintiffs) there
24 resided the trade secrets that had been misappropriated by the Emerson defendants." (JS Ex.
25 H at 116-17; see Platinum's Supp'l Mem. Ex. A).  That is not the case with Platinum's documents,
26 which did "not analyze or put a price tag on the value of the subject technology at issue," or value
27 Emerson's sub-units individually.  (JS at 24).  Moreover, Platinum has demonstrated that the
28 disclosure of its proprietary and confidential information would be harmful to its interests (see JS

11

at 21-25, Kotzubei Decl. ¶¶ 10-17), and plaintiffs have not shown that the "global" level of information in Platinum's possession is relevant to plaintiffs' damages claim or defendants' unjust enrichment, or to any of the parties' claims or defenses. The Court has balanced the seeming lack of relevance of the discovery being sought, and plaintiffs' alleged need for the information, against the potential hardship to non-party Platinum should it be required to turn over commercially sensitive trade secret information to a competitor. With only plaintiffs' speculative showing that the information may be relevant to plaintiffs' claims or defenses, or otherwise necessary in this action, Platinum's interest in the confidentiality of the information outweighs plaintiffs' need for it.

Based on the foregoing, plaintiffs' Motion as to these Requests is **denied**.

### 2. Request No. 8

This Request seeks documents "relating to the [underlying] Litigation." Platinum represents that it has already produced the few documents responsive to this Request in its possession,[6] and that because "the purchasing entity and its affiliates are indemnified with respect to the underlying litigation," "Platinum had little incentive or ability to conduct more than cursory diligence into the underlying dispute." (JS at 5, Kotzubei Decl. ¶¶ 18-20). It states that plaintiffs' suggestion that "Platinum has documents discussing the litigation and the value of the potential loss that Emerson might be liable for if Plaintiffs prevail on their claims," is a fishing expedition, and that "no such documents exist." (JS at 20; see JS Kotzubei Decl. ¶¶ 18-20).

Based on the foregoing, **no later than August 4, 2017**, Platinum shall provide plaintiffs with a declaration, signed under penalty of perjury by a corporate officer, confirming that it does not have any additional documents in its possession "discussing the litigation and the value of the potential loss that Emerson might be liable for if Plaintiffs prevail on their claims," or otherwise responsive to Request number 8, including any documents it might have withheld based on its

---

[6] According to plaintiffs, Platinum produced only copies of the original and Second Amended Complaint in the underlying litigation. (JS at 9-10).

attorney-client privileged or work product protected objections.[7]  Subject to Platinum providing such a declaration, plaintiff's Motion to compel further documents in response to Request number 8 is **denied**.  In the absence of such a declaration, Platinum shall produce any additional responsive documents in its possession.

## IV.
## CONCLUSION

Accordingly, the Court **denies** plaintiffs' Motion as set forth above.  **No later than August 10, 2015,** defendant shall produce the declaration, or the documents and/or privilege log responsive to Request number 8 as set forth above.

**It is so ordered**.

DATED:  July 28, 2017

*Paul L. Abrams*

PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE

---

[7] If any privileged or protected documents have been withheld, then Platinum shall provide plaintiffs with a sufficiently detailed privilege log to enable plaintiffs to evaluate the applicability of the privilege or other protection.  Fed. R. Civ. P. 26(b)(5); Clarke v. Am. Comm. Nat'l Bank, 974 F.2d 127, 129 (9th Cir. 1992); see The Rutter Group, Cal. Practice Guide, Fed. Civ. Proc. Before Trial, Form 11:A (Privilege Log).